**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CAMERON INTERNATIONAL CORPORATION, | § § § | CIVIL ACTION NO. 4:18-CV-02533 |
| Plaintiff, | § § | |
| vs. | § § | JURY TRIAL REQUESTED |
| NITRO FLUIDS L.L.C., | § § | |
| Defendant. | § § | |

**DEFENDANT NITRO FLUIDS' REPLY IN SUPPORT OF
MOTION FOR JUDGMENT AS A MATTER OF LAW
FOR NO WILLFUL INFRINGEMENT (DKTS. 384, 408)**

During this lawsuit, Cameron asserted <u>seven</u> patents against <u>one</u> Nitro system. Nitro began renting this system in 2017, **before** the '800 Patent or '645 Patent ("Asserted Patents") issued,[1] **before** Nitro knew about Cameron's system, and **before** Nitro knew about <u>any</u> Cameron patents. Shortly thereafter, Cameron sent Nitro its only notice letter, accusing Nitro's system of infringing the '430 and '450 Patent. The Asserted Patents, which did not yet exist, were not identified in the letter. In response, Nitro continued renting its **nonadjustable** system because the '430 and '450 Patents require adjustability. Cameron sued Nitro on the '450 and '430 Patents in July 2018 but dismissed both patents with prejudice five months later, because Nitro's system is nonadjustable.

Willful infringement requires that a patent exist, that the accused have knowledge of it, and that the accused engaged in *some* "intentional" or "deliberate" conduct. Because the '645 Patent and '800 Patent did not exist prior to July 2018, there is no pre-suit willful infringement as a matter of law. Because the Asserted Patents issued ***while this lawsuit was already pending***, Nitro merely continuing to rent a system it had been renting long ***before the Asserted Patents existed*** and before suit was filed, is legally insufficient to show "intentional" conduct by Nitro, particularly since the accused system was already found to not infringe the only two patents Cameron asserted against Nitro in its pre-suit notice letter. There simply is no evidence of **willful** patent infringement, and the Court should grant Nitro's motion for judgment as a matter of law.

**A.    There is no pre-suit willfulness because the Asserted Patents did not exist pre-suit.**

After *Halo*, "[k]nowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir.

---

[1] The '800 Patent issued April 2018, and Cameron failed to notify Nitro of this patent's existence until it added it to the lawsuit on **September 7, 2018.** The '645 Patent issued August 2019 and Cameron alleges it notified Nitro of it in **October 2019** but Nitro did not receive notice of potential infringement until **February 2020**. Both dates are post-suit (i.e. after July 2018).

2016).² Because it is undisputed that the Asserted Patents did not exist pre-suit, there is no pre-suit willful infringement as a matter of law. In other words, **it is impossible that Nitro infringed, much less willfully infringed, prior to September 2018** when the earliest Asserted Patent issued. Cameron attempts to avoid this precedent by muddying the issues and the law.

      1.      <u>Alleged knowledge of a patent application is insufficient for willfulness</u>.

Cameron argues that the evidence "is more than sufficient to show that Nitro had pre-suit knowledge of both the '800 Patent and the '645 Patent." Resp. at 5. Examined carefully, Cameron's argument is actually that the '800 Patent <u>Application</u>, a child of the '430 Patent, was pending at the time of the March 2017 cease-and-desist letter. First, Cameron does not explain how the pendency of the '800 Patent Application put Nitro on notice of the '645 Patent Application—that is because the '645 Patent Application was not filed until November 2018. Second, simply because the '800 Patent Application was a child of the '430 Patent does not mean Nitro had any idea of its existence, and Cameron has not identified <u>any</u> evidence presented to the jury to support that Nitro had knowledge of it.³ Third, and most importantly, knowledge of a patent application is insufficient under Federal Circuit law for a finding of willfulness, because a patent application "is no guarantee any patent will issue." *State Indus.*, 751 F.2d at 1236; *see also Fleet Eng'rs, Inc. v. Mudguard Techs., LLC*, 2023 U.S. App. LEXIS 21178, at *22 (Fed.

---

²*See also Bayer HealthCare v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021); *Eko Brands, LLC v. Adrian Rivera Maynez, Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020); *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985).

³ Cameron confusingly cites Mr. Simpson's testimony to suggest Nitro knew of the '800 and '645 applications in March 2017. But the '645 application did not exist in 2017, and Mr. Simpson was merely asked about when Nitro learned that Cameron had <u>patents</u> that did not require swivels—he was not asked about any applications. Dkt. 426-1 at 6-7. Indeed, Cameron did not ask any Nitro witnesses about the '645 and '800 applications because the answer to this question would hurt Cameron's position. Moreover, Mr. Simpson's testimony does not show knowledge of either Asserted Patent, because neither patent existed in 2017. Dkt. 426 at 10.

Cir. 2023) (same). Thus, even if there were any evidence that Nitro had knowledge in 2017 of the '800 application (there is not) or the '645 application (which had not been filed), this would be insufficient to support the knowledge requirement under Federal Circuit precedent or to overcome the fact that no conduct prior to September 2018 can constitute willful infringement.

Cameron mischaracterizes *WCM* to suggest that pre-suit knowledge is not required for willfulness and that knowledge of patent applications may suffice. Resp. at 5. But in WCM, there was "sufficient evidence for a reasonable jury to conclude that IPS did know of WCM's patents … before the lawsuit was initiated." *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 970 (Fed. Cir. 2018) (nonprecedential). Here, it is undisputed that the Asserted Patents did not exist pre-suit. Moreover, **WCM expressly declined to hold that knowledge of a patent application satisfies the knowledge requirement for willfulness**. *Id.* n.4. In sum, *WCM* did not overturn black letter law that knowledge of a patent (not an application) is a prerequisite for willfulness.[4]

Cameron's reliance on *SIMO Holdings* is similarly misplaced because the asserted patent *existed* pre-suit, and the Court held that that the jury's inference of knowledge "might not have been reasonable had [infringer] adduced evidence establishing when, in fact, it learned of the patent." *Simo Holdings, Inc. v. H.K. uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 334-35 (S.D.N.Y. 2019). Here, the undisputed evidence is that Nitro learned of the patents post-suit, so no reasonable jury could conclude Nitro had pre-suit knowledge based on patent applications.

2. <u>Nitro did not have pre-suit knowledge of the '645 Patent.</u>

Cameron vaguely alleges that "Nitro learned of the '645 Patent in October 2019, prior to

---

[4] *WCM* is also inapplicable because the infringer's employee testified that he had monitored the patentee's products for decades, the patented product and infringing product had identical measurements, the infringing product was compatible with the patented product, and the infringer had a history of copying the patentee's products. No such evidence is present here.

when Cameron first asserted the '645 Patent in February 2020" and that this shows pre-suit knowledge of the '645 Patent. Resp. at 5. But this lawsuit was filed in July 2018, not February 2020. Even assuming Cameron's October 2019 notice date is correct (it is not),[5] Nitro learned of the '645 Patent *after* suit was filed. Cameron's reference to "pre-suit" is a reference to the second lawsuit Cameron filed in an improper venue in the WDTX in February 2020. Ex. A. Because the '645 Patent is in the same family of patents asserted in this suit and because Cameron accused the same Nitro system that is accused in this lawsuit, the WDTX case was transferred to this Court after two writs of mandamus to the Federal Circuit. Ex. B. After the transfer, this Court called Cameron's second suit an "abuse of the Court with [] guerilla extortion by hyper pleading." Dkt. 128 at 2. Cameron cannot use its past gamesmanship to now argue that Nitro had "pre-suit" knowledge of the '645 Patent, based on a lawsuit that should have never existed.

**B.    Nitro's pre-patent conduct supports that there was no willful infringement.**

Cameron cannot avoid that there can be no pre-suit willful infringement when the patents did not exist pre-suit, so it urges the Court to find that Nitro copied Cameron's system in March 2017 (prior to issuance of the Asserted Patents) and claims this is legally sufficient evidence for willfulness. Resp. at 3-4. There are several errors in Cameron's arguments.

First, Cameron ignores the evidence from March 2017 that supports no willfulness. The only accusation Cameron had levied against Nitro's frac system in March 2017 was that the system was adjustable and thus, infringed the '450 Patents and '430 Patents. Dkt. 426-2. Nitro informed Cameron that its system could not infringe because it was not adjustable and offered Cameron an inspection to prove noninfringement. Dkt. 78 at 7; Dkt. 78-1 ¶¶ 4-9. Cameron

---

[5] The October 2019 settlement communication notified Nitro's counsel of the '645 Patent, it was insufficient to put Nitro itself on notice of the patent.

ignored this offer and sued Nitro on the '450 Patent and '430 Patent. Dkt. 1. When Nitro informed the Court that it had offered Cameron a pre-suit inspection of its system, Cameron finally agreed to inspect Nitro's system. Dkt. 175-8 at 17:25-19:23, 31:16-17. After the inspection, Cameron conceded that Nitro's system could not infringe because it was not adjustable and dismissed the '450 and '430 Patents with prejudice. Dkt. 37 at 2. Thus, Nitro's rental of its system from March 2017 to September 2018 did not infringe the only two patents Nitro knew about and the only two patents Cameron had asserted against Nitro, and Nitro was completely justified in continuing to rent that same system after Cameron added the '800 Patent and '645 Patents to the lawsuit. Such continued renting simply cannot constitute willful infringement. *M & C Innovations, LLC v. Igloo Prods. Corp.*, 2018 U.S. Dist. LEXIS 152075, at *14 (S.D. Tex. 2018) (Ellison, J.) ("Assuming… Igloo continued its manufacturing its infringing products, this would simply be the kind of 'garden-variety' patent case that *Halo* affirms is ill-suited for a finding of willfulness."). Notably, Cameron did not address this argument in its response. Moreover, Cameron was aware of Nitro's system and could have warned Nitro that it was prosecuting patents that would cover Nitro's system, but Cameron chose to lay behind the log and allow Nitro to continue renting its system without warning.

Moreover, Cameron is wrong that any evidence supports copying. Cameron regurgitates the exact arguments it made in support of its request for enhanced damages (Dkt. 409), which Nitro addressed in its responsive brief. (Dkt. 429 at 3-4). Specifically, Cameron alleges there is evidence that Nitro copied Cameron's system when it did a job for Oxy. But Nitro's Mr. Harper testified that Nitro did not even know of Cameron's system until it received Cameron's cease-and-desist letter, which was after the Oxy job, meaning Nitro could not have copied Cameron's system when it performed the Oxy job. Dkt. 426-1 at 30-31, 36; Dkt. 426-2; Dkt. 410-2. Cameron

5

has not identified any evidence supporting that Nitro had knowledge of Cameron's system when Nitro designed and began renting it, such that Nitro could have copied it.

Because there is no evidence that Nitro had knowledge of Cameron's system, Cameron presents tenuous and speculative evidence to suggest there was copying. Mr. Ganzinotti, a former head of a Cameron division that oversaw fracking, testified that he heard from an unidentified person at Cameron that an unidentified person at Oxy said that "as long as [Nitro provides] a copy of [Cameron's] system, we're going to continue to use Nitro." Dkt. 426-1 at 3. Cameron does not deny that Mr. Ganzinotti's testimony is double hearsay but contends in a footnote that the Court should find sufficient evidence of copying anyways, simply because Nitro did not raise its hearsay objection at trial. Resp. n.1. Admissibility is not the issue—the issue is whether this double hearsay could possibly be accorded any weight by a reasonable jury. Even if it could, the testimony is insufficient for a jury to find that Nitro copied Cameron's system in 2017, because it merely supports that Oxy wanted a copy of Cameron's system, not that Oxy ever communicated this to Nitro. Cameron has not identified any case where a court has found sufficient evidence of copying based on such insufficient evidence.

More importantly, the jury heard testimony from Cameron's own witnesses that shows that Nitro's system was **not** a copy of Cameron's system. Mr. Ganzinotti and Dr. Wooley admitted that Nitro's system lacked the swivels of Cameron's system, conceding that Nitro's system was not a copy. **Cameron does not deny that Nitro's system lacked swivels** but argues that the lack of swivels does not negate Nitro's alleged copying, "much like changing one line of text does not negate plagiarizing." Resp. at 4. But Cameron omits that these swivels were a critical component of its system and the component that made its system adjustable. Mr. Guidry, the inventor of the Asserted Patents, repeatedly testified that the swivels in Cameron's system

were a deliberate and important design choice. Ex. C at 3-5 ("the design that we thought was best to take to market for our customers *our customers agreed on that* was to put the swivel and the adjustment in the line itself."). When asked why Cameron chose swivels, he responded:

> I mean, if you recall the word "cumbersome" came up. Everyone thought with a single line, it would be very difficult, and we wanted to have the best product in the market. So we decided the swivels were going to be -- work the best and be able to connect a single line from Point A to Point B.

*Id.* at 8. Even Cameron's marketing materials touted its "patented swivel flange technology." *Id.* at 5; Ex. D. Thus, the swivels were a key feature of Cameron's product.[6] If Oxy, a customer of Cameron, truly wanted a copy of Cameron's system, or if Nitro had copied the system, then the alleged copy would have included the main functionality touted to Cameron's customers. That Nitro's system never included swivels proves that there was no copying. *See* Dkt. 37 at 2.[7]

Camero's reliance on *3M* is misplaced. In *3M*, Defendant JJO stole Plaintiff 3M's trade secrets prior to issuance of the asserted patent and JJO's in-house counsel was involved in the trade secret theft, was copied on internal memos discussing the stolen trade secrets and prosecuted a patent application based on the stolen trade secrets. *3M v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1581-82 (Fed. Cir. 1992). The Special Master found willfulness based on several factors, including JJO's long history of copying various 3M products, JJO's intense business rivalry with 3M, and the fact that in-house counsel's pre-patent

---

[6] Indeed, the adjustability provided by the swivels were key elements of the '450 and '430 Patents (the only patents asserted in 2017), as evidenced by Cameron dismissing them with prejudice. Even if Nitro had knowledge of Cameron's system and these patents at the time (it didn't), omitting the swivels would have been a laudable design around, not copying. Moreover, alleged copying of a system predating a patent's issuance cannot be a basis for willful infringement when the patent later issues, especially when the accused had no knowledge of pending applications.

[7] Cameron allegation regarding Nitro's use of "monoline" is addressed in Dkt. 426 at 4.

7

involvement in trade secret theft suggested that the counsel's oral noninfringement opinion was an unreliable defense to willfulness. *Id.* at 1582. Thus, in-house counsel's pre-patent conduct (trade secret theft) is exactly what rendered JJO's willfulness defense unreliable, rendering it relevant, though not dispositive, to willfulness. *Id.* (rejecting JJO's argument that the willfulness finding was based "solely" on pre-patent conduct). By contrast, no such facts supporting willfulness are present here. And, as argued above, Nitro's pre-patent conduct supports no willfulness. Because there is no evidence of copying, no pre-patent conduct supports willfulness.

## C. There is no evidence of post-suit willful infringement.

Because Nitro did not have knowledge of either Asserted Patent until well after suit was filed, the conduct most relevant to willfulness is Nitro's continued infringement post-suit. As Nitro's JMOL explained, "[c]ontinuing typical garden-variety infringement post-suit does not amount to willful infringement." Nitro cited several cases where courts determined there was no willfulness under *Halo* where the accused infringer learned of the patents from the lawsuit and did nothing more than continue infringement post-suit. *See* Dkt. 408 at 2. *Bayer Health* is exactly on point. There, the Federal Circuit affirmed the district court's grant of JMOL of no willful infringement even though the accused infringer had knowledge of the patent application, knowledge of the patent, and was found to infringe, because there was no evidence to show intentional infringement. *Bayer HealthCare*, 989 F.3d at 987 ("Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness. **Rather, willfulness requires deliberate or intentional infringement**.") (emphasis added); *Fleet Eng'rs*, 2023 U.S. Dist. LEXIS, at *22 (no willfulness where evidence merely showed the accused continued selling infringing products that it had been selling prior to issuance of the patents).

Cameron ignores this law to avoid explaining why this Court should depart from the general rule that merely continuing to sell an infringing product during a lawsuit does not

8

constitute "intentional" or "deliberate" infringement. Instead, Cameron vaguely argues that "Nitro's post-suit conduct alone supports willful infringement," citing *Apple* and *EagleView* in support. But in *Apple*, the district court upheld the jury's finding of willfulness based on clear evidence of willfulness including that Samsung did not dispute that it copied Apple's patented iPhone features, and internal Samsung presentations had guidance on how to make Samsung features more Apple-like. *Apple*, 258 F. Supp. at 1027. *EagleView* is not even about willfulness, it is about enhancement. Cameron misleadingly cites *EagleView's* discussion of the sixth *Read* factor, duration of infringement, to suggest that post-suit infringement constitutes willfulness, even though *EagleView* says no such thing. *Eagleview*, 522 F. Supp. at *53.

Because Cameron cannot get around this law, it regurgitates arguments made in request for enhanced damages. Specifically, Cameron argues that the verdict is supported by substantial evidence because Nitro's infringement was so obvious that Nitro knew it was infringing, which argument Nitro addressed in Dkt. 426 at 9-11. Resp. at 7. Importantly, Cameron's claim that infringement was "so obvious" is belied by the fact that Cameron did not seek a preliminary injunction, only sought summary judgment of infringement on claim 11 of the '800 Patent (which this Court denied), and that Nitro conceded infringement *after* the Court construed disputed claims terms. *Id.*; *NexStep, Inc. v. Comcast Cable Commc'ns,* 2021 U.S. Dist. LEXIS 177819, *39-40 (D. Del. Aug. 20, 2021) (post-complaint infringement is insufficient for willfulness particularly when the patentee did not seek preliminary injunction and the infringer asserted reasonable defenses.).

Second, Nitro had good-faith invalidity defenses, including based on its successful cancellation of several claims of the '800 Patent in an *inter partes* review, its expert's opinions on invalidity, and the fact that Nitro did not move for summary judgment on Nitro's invalidity

9

defenses or challenge the admissibility of Nitro's invalidity expert. Dkt. 426 at 4-9.[8] Cameron claims that Nitro's pre-verdict JMOL did not argue that Nitro had a reasonable basis to believe the patents were invalid and that Nitro waived this argument. Cameron is flat-out wrong, because Nitro's pre-verdict JMOL (filed prior to submission to the jury) clearly included this argument:

> Nitro had and has a reasonable basis for continuing to use its systems in the same pre-suit ways. In the IPR, the PTAB found a number of Cameron's '800 patent claims invalid (including claim 17, from which asserted claim 18 depends), and Nitro has presented evidence of its good faith belief that Cameron's patents are invalid.

Dkt. 384 at 3; Ex. E at 3-5.

Third, none of Cameron's arguments overcome the fact that Nitro merely continuing to rent its system does not show the intentionality required for willfulness. As this Court explained:

> Assuming for the sake of argument that the complaint put Igloo on notice of the existing patents, and Igloo continued its manufacturing its infringing products, this would simply be the kind of "garden-variety" patent case that *Halo* affirms is ill-suited for a finding of willfulness. Moreover, **this post-suit fact pattern characterizes every infringement action except for those in which an alleged infringer immediately ceases production following service of the complaint. MCI has offered no allegations suggesting that Igloo deliberately re-dedicated itself to infringing after being served with the complaint**. Contrast, for example, *Simplivity Corp. v. Springpath, Inc.*, in which the court found a cognizable post-suit willful infringement claim where a patentee made allegations that there was "escalation" of infringement post-complaint (i.e., retaliatory behavior driven by an infringer's awareness that "litigation was afoot"). Here, no such allegation has been made.

*M & C Innovations*, 2018 U.S. Dist. LEXIS at *14 (S.D. Tex. 2018) (Ellison, J.); *Slot Speaker Techs., Inc. v. Apple, Inc.,* 2017 U.S. Dist. LEXIS 161400, *8 (N.D. Cal. Sept. 29. 2017). Because Nitro did nothing more than continue renting a product it had been renting since well-before the patents issued, there is no evidence to support a finding of post-suit willfulness.

---

[8] *WBIP* does not preclude Nitro from raising the reasonableness of its defenses. *WBIP* merely articulated that after *Halo*, reasonable defenses cannot insulate an infringer from willfulness where the evidence **also** shows the accused knew of the patent and had an intent to infringe it.

10

Dated: January 24, 2024

Respectfully submitted,

*/s/ J. David Cabello*
**J. David Cabello**
*Attorney-in-charge*
Texas Bar No. 03574500
S.D. Texas I.D. No. 3514
**James H. Hall**
Texas Bar No. 24041040
S.D. Texas I.D. No. 36,904
**Stephen Zinda**
Texas Bar No. 24084147
S.D. Texas I.D. No. 1,692,382

Cabello Hall Zinda, PLLC
801 Travis Suite 1610
Houston, Texas 77002
Tel.: 832.631.9990
Fax: 832.631.9991
Email: David@chzfirm.com
Email: James@chzfirm.com
Email: Stephen@chzfirm.com
*Attorneys for Defendant*
**NITRO FLUIDS, L.L.C.**

11

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above document has been served on January 24, 2025 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per the Local Rules.

*/s/ John Watkins*
John Watkins
Paralegal